Sealed

FILED by ___ D.C.

MAY 24 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NOS. 07-20794/11-20244-CRIMINAL-LENARD

UNITED STATES OF AMERICA,                    Miami, Florida

                    Plaintiff,              May 9, 2011

          vs.                                3:11 p.m. to 4:18 p.m.

CARLOS MARIO JIMENEZ NARANJO,

                    Defendant.              Pages 1 to 44

---

**SEALED** SENTENCING HEARING
BEFORE THE HONORABLE JOAN A. LENARD,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:        ANDREA G. HOFFMAN, ESQ.
                           ASSISTANT UNITED STATES ATTORNEY
                           99 Northeast Fourth Street
                           Miami, Florida 33132

FOR THE DEFENDANT:         HUGO A. RODRIGUEZ, ESQ.
                           HUGO RODRIGUEZ & ASSOCIATES
                           1210 Washington Avenue, Suite 245
                           Miami Beach, Florida 33139

FOR US PROBATION:          WENDY SQUITERO

REPORTED BY:               LISA EDWARDS, CRR, RMR
                           Official Court Reporter
                           400 North Miami Avenue
                           Twelfth Floor
                           Miami, Florida 33128
                           (305) 523-5499

1          THE COURT:  Good afternoon.  You may be seated.

2          United States of America versus Carlos Jimenez

3     Naranjo, Cases Numbered 07-20794 and 11-20244.

4          Is that all the cases?

5          MS. HOFFMAN:  It is, your Honor.

6          THE COURT:  Counsel and Probation, state your

7     appearances, please, for the record.

8          MS. HOFFMAN:  Andrea Hoffman for the US Attorney's

9     Office, your Honor.

10          This matter is still part of a sealed record.  The

11     persons in the courtroom right now include the Court's staff,

12     marshals, agents for the Government and lawyers or

13     investigators for the defense team.

14          There are no un -- inappropriate persons in the

15     courtroom.  But I think we probably have to seal the courtroom.

16          THE COURT:  Okay.  I take it you have no objection to

17     that, Mr. Rodriguez?

18          MR. RODRIGUEZ:  Oh, no, your Honor.

19          THE COURT:  Would you state your appearance first.

20          MR. RODRIGUEZ:  Will do.

21          Hugo Rodriguez on behalf of Carlos Jimenez Naranjo.

22          And we're here for sentencing, your Honor.

23          THE COURT:  And I will grant the motion to seal the

24     courtroom and order that this courtroom be sealed at this time.

25          (Whereupon, the courtroom was duly sealed.)

1          MR. RODRIGUEZ:  Thank you.

2          Your Honor, we will rely on the Court's certified

3   translator whose expertise we acknowledge.

4          We're prepared to proceed with sentencing.

5          THE COURT:  The courtroom is now sealed.

6          Mr. Jimenez is set for sentencing today.

7          Mr. Jimenez, have you read the revised advisory

8   presentence investigation report or was it read to you?

9          THE DEFENDANT:  Yes, your Honor.

10         THE COURT:  And have you and your attorney discussed

11  the revised advisory presentence investigation report?

12         THE DEFENDANT:  Yes, your Honor.

13         THE COURT:  My examination of the file indicates that

14  neither the Government nor the Defendant have filed any

15  objections to the revised advisory presentence investigation

16  report.  The Defendant filed a sentencing recommendation.

17         Has that been filed, Mr. Rodriguez?

18         MR. RODRIGUEZ:  It was, your Honor, on the 24th of

19  February.

20         THE COURT:  Okay.

21         MR. RODRIGUEZ:  But I can't access it.  It just says

22  "Filed Document."

23         THE COURT:  What we're going to do is make sure --

24  well, we should be able to.  Patricia's going to check.  I want

25  to make sure that it's properly on the record.

```
 1          But is that correct, that it was a sentencing
 2   recommendation by the Defendant and no objections?
 3          MR. RODRIGUEZ:  We didn't file any objections, your
 4   Honor, at all.
 5          It is our recommendation and just goes to one caveat
 6   of the plea agreement.
 7          THE COURT:  We're going to get there.  We're not there
 8   yet.
 9          There were no objections by the Government.  Correct,
10   Ms. Hoffman?
11          MS. HOFFMAN:  Correct, your Honor.
12          THE COURT:  And does the Government make the motion
13   for the third level off under 3E1.1(b)?
14          MS. HOFFMAN:  The Government does so make that motion,
15   your Honor.
16          THE COURT:  That motion is granted.
17          The Court will adopt the factual findings and
18   guideline applications as contained in the revised advisory
19   presentence investigation report.
20          Before going further, I would ask counsel to review
21   with me the major calculations in the revised advisory
22   presentence investigation report.
23          The offense level is 49; the criminal history category
24   is Roman numeral I; the advisory guideline range is life
25   imprisonment, five years' supervised release, 25,000 to a
```

```
1     $12,250,000 fine; and $400 special assessment.

2            Is that correct in its totality as far as the advisory

3     guidelines are concerned?

4            MS. HOFFMAN:  It is, your Honor, although -- it is.

5            THE COURT:  Do you agree, Mr. Rodriguez?

6            MR. RODRIGUEZ:  There's two counts here and two counts

7     in Washington.  That's correct, your Honor.  Four counts here

8     now.  Excuse me.

9            THE COURT:  Mr. Jimenez, you're in Court today to

10    receive your sentence.  Before that happens, I must ask you if

11    there's any legal cause as to why the sentence of the law

12    should not be imposed upon you.

13           THE DEFENDANT:  No, your Honor.

14           THE COURT:  No legal cause having been shown as to why

15    sentence should not be imposed, the Court will consider

16    whatever you may wish to say in mitigation.

17           Mr. Rodriguez?

18           MR. RODRIGUEZ:  Your Honor, would it be appropriate

19    for me now to address our recommendation?

20           THE COURT:  Yes.

21           MR. RODRIGUEZ:  Your Honor, as the Court is aware,

22    Mr. Jimenez pled guilty in two separate indictments, one in

23    Washington, DC, and one before this Court, both of which have

24    now been consolidated before this forum.

25           Prior to my representation --
```

THE COURT:  Can you just review with me what counts he

pled guilty -- on the 07-20794, second superseding indictment,

he pled guilty to Counts 1 and 18.  Is that correct?

MS. HOFFMAN:  It is correct, your Honor.

THE COURT:  And on the 11-20244 case, he pled guilty

to which counts?

MS. HOFFMAN:  It's an information, your Honor.  He

pled guilty, I believe, to Counts 1 and 2, which are both

counts of the information.

THE COURT:  Counts 1 and 2 of the information.

And that plea of guilty actually took place in

Washington, DC.  Correct?

MS. HOFFMAN:  It did, your Honor.  It took place on

January 7th of 2010.

THE COURT:  Okay.

MR. RODRIGUEZ:  That's correct.

THE COURT:  I'm sorry, Mr. Rodriguez.  I interrupted

you.

MR. RODRIGUEZ:  That's fine.

THE COURT:  I just wanted to make sure I had that

straight.

MR. RODRIGUEZ:  Your Honor, the plea agreements -- as

I was advising the Court, at that time, counsel was not

involved in the case, nor was I representing my client at the

time.

1           There were two what I'd like to call mirror image plea
2   agreements.  Those agreements reflect the agreement that the
3   United States Government has with the Colombian Government.
4   There is no extradition treaty, but there is an agreement and
5   an accord.
6           Pursuant to that agreement between the countries,
7   which we're going to ask the Court to honor, the United States
8   agreed that it could not sentence Mr. Jimenez Naranjo -- or ask
9   for a sentence of life.
10          Somewhere prior to my involvement, the term of art,
11  which is referred to in our plea agreement, was placed in there
12  and it says that the parties agree to jointly recommend that
13  the Court sentence the Defendant to terms of imprisonment of up
14  to 35 years.
15          THE COURT:  And where is that in the plea agreement?
16          MR. RODRIGUEZ:  The plea agreement, Page 2,
17  Paragraph 3.
18          THE COURT:  Okay.
19          MR. RODRIGUEZ:  I didn't quite understand this, your
20  Honor, and I've met with the Colombian counsel that's here and
21  done some other work.  And everybody has an impression or an
22  idea.  But, basically, the philosophy was the following:
23          We have to come to an age of what the Defendant would
24  be and then the Court to impose a sentence to make sure that it
25  wouldn't be a life imprisonment sentence.

It was that organization that referred me to the World Bank life expectancy records which, in turn, referred me to the CIA's world population statistics of December of 2010, which was just recent.

And, in essence, to cut to the chase, an individual -- a male individual born in Colombia at that time would have a life expectancy of 71 years. A woman would have a life expectancy now, today's date, of 78. The average of that or the mean would be 74.3.

We believe that we'd like the Court to honor the agreement between countries, not sentence him to life and a sentence of up to 35 years. But I really believe that the only just and prudent way to approach it is to exactly know what his age would be.

The reason I did this this way, your Honor, is not too long ago I had a sentencing before another judge in this district. The Government had recommended a Rule 35 from a life of imprisonment. The question was: What type of a percentage of a reduction do you give?

After much consultation with the Sentencing Commission and things, what the judge -- the Court did there was find pursuant to the current life expectancy actuarial sheets what the life would be for that client of mine, which was an African-American male, and set that date and then, from there, reduce the amount that the parties had requested.

In that same philosophy, I believe that, before the Court could grant -- before the Court could sentence, we -- the Court should know what his life expectancy would be.

Knowing that there are many variables that affect that, we're not here to ask the Court to impose what our US Government would say would be for a Colombian male of 71.

We're willing to accept the median or mean age, which is almost 75, the point being, your Honor, if the Court were to sentence Mr. Naranjo to a sentence of 35 years today, he would be, in essence, sentenced to a term of life imprisonment because it would be --

THE COURT REPORTER: I'm sorry. Say that again.

MR. RODRIGUEZ: Mr. Naranjo is 45 years of age. A sentence of 35 years would be a sentence up until the time he is 80 years of age, which would be tantamount to a life sentence, which we believe --

THE COURT: Not taking into account any gain time.

MR. RODRIGUEZ: No.

THE COURT: Right?

MR. RODRIGUEZ: I haven't.

I did that when I -- I sort of did that when I -- instead of accepting the 71, I took the 74.3, because I did the math and it's almost the same, to be honest with you, your Honor.

So the point is that I think that it would not have an

1    adverse impact on the integrity of the agreement between

2    countries if the Court were to sentence him based on his life

3    expectancy.

4         I've added in the fudge factor there, which is even

5    higher, or it could be the credit for good time, but there is

6    no absolute that he would get that.  But even that, it would

7    still be 74.3.

8         And I'm going to recommend to the Court 75, because

9    what I'm going to say to the Court is that I think a fair and

10   just sentence, which would not require him life, would be a

11   sentence of 30 years.

12        THE COURT:  Does that complete your presentation?

13        MR. RODRIGUEZ:  I have one other factor later on, but

14   I think it's going to be agreed to.  That is just credit for

15   his foreign incarceration pursuant to 3585(b).  That's not

16   going to be an issue.

17        THE COURT:  And how long was that?

18        MR. RODRIGUEZ:  June 1 -- August 16th, '06.  I'm

19   sorry.

20        THE COURT:  When was he brought here?

21        MR. RODRIGUEZ:  In --

22        MS. HOFFMAN:  He wasn't even indicted in the United

23   States, your Honor, until 2007.  He came in, I believe, in

24   March of 2008.

25        MR. RODRIGUEZ:  May 6, 2008, your Honor.

1          MS. HOFFMAN:  May.  It was an "M."

2          THE COURT:  So he wasn't incarcerated in Colombia,

3     then, on this case?

4          MS. HOFFMAN:  Not from 2006 -- in terms of the charged

5     cases, not from 2006 onward.  But, your Honor, he was in a

6     unique status compared to a lot of Defendants you might see.

7     He was in what's called the "justice and peace process" in

8     Colombia.

9          What that means is that, starting in early -- there

10    was an opportunity offered by the Colombian Government to the

11    leaders of the AUC and FARC organizations to lay down their

12    arms, their assets and their -- stand down their armies and

13    they could enter into a criminal justice process for their

14    drug-trafficking activities in Colombia with determined

15    sentences that were agreed upon and organized in Colombia.

16         One of the requirements to receive those benefits

17    included cessation of any further criminal activity.

18         THE COURT:  And was there cessation of criminal

19    activity?  No.

20         MS. HOFFMAN:  No.

21         And so he was -- from the Government -- from the

22    United States Government's perspective, he was kicked out of

23    the justice-and-peace process and made eligible for

24    extradition, because persons within that justice-and-peace

25    process were not eligible for extradition to the United States.

```
 1              THE COURT:  So when did he become eligible for
 2   extradition --
 3              MS. HOFFMAN:  He was --
 4              THE COURT:  -- on this case?
 5              MS. HOFFMAN:  He was indicted in August of 2007, I
 6   believe, your Honor.
 7              THE COURT:  On the '07 case?
 8              MS. HOFFMAN:  On the '07 case.
 9              The DC indictment was 2005, your Honor, actually.  I
10   just -- that just snapped in my head as I'm speaking aloud,
11   your Honor.  The DC case is actually 2005.
12              THE COURT:  So he was indicted in the '11 case, 20244,
13   which is a Rule 20 DC case?
14              MS. HOFFMAN:  Correct.
15              THE COURT:  And that was in 2005?
16              MS. HOFFMAN:  It was, your Honor, in fact.
17              MR. RODRIGUEZ:  It was.
18              That's why -- it.
19              MS. HOFFMAN:  It goes back to the August of 2006.
20              MR. RODRIGUEZ:  August 16th, 2006.  Correct.
21              THE COURT:  All right.
22              MS. HOFFMAN:  And I also was not the attorney of
23   record when these pleas went out and I forgot that factor, your
24   Honor.
25              THE COURT:  Okay.
```

```
 1              MS. HOFFMAN:  So I talked to myself in a circle on my
 2   feet here.
 3              THE COURT:  Mr. Jimenez, is there something you wish
 4   to say, sir?
 5              THE DEFENDANT:  No, your Honor.
 6              THE COURT:  What does the Government say?
 7              MS. HOFFMAN:  Before the Court sentences, there's one
 8   just typographical error that I've just noticed in the PSI
 9   that -- this case is going to be around for a while.  I'd like
10   to make sure we fix it.
11              Page 18, Paragraph 70.
12              THE COURT:  Of the revised report?
13              MS. HOFFMAN:  Of the revised report, your Honor.
14              While the report is correct that the 2005 case will be
15   dismissed, I think it would be important to note that the
16   sentence -- that that case got converted into the 10-008
17   criminal information.
18              THE COURT:  Okay.
19              MS. HOFFMAN:  So what's getting dismissed -- the way I
20   read it at first, I was thinking we were dismissing all of the
21   DC charges, and I don't want that to be something that hangs us
22   all up later.
23              I know the front of it -- because this case now has
24   multiple numbers, it went from an '05 case to a 2010 DC case to
25   a 2011 Southern District of Florida case.
```

1          I think somewhere -- and this may or may not be the

2     right place to do it, but somewhere we might want to make a

3     little more clear this mutation of charges against this

4     Defendant.

5          THE COURT:  This case is really not being dismissed.

6          MS. HOFFMAN:  No.

7          THE COURT:  It was Rule 20'd here.

8          MS. HOFFMAN:  The 2005 case has -- you know how we

9     always dismiss the remaining counts as they stand against this

10    Defendant at the time of sentencing?

11         The 2005 case in its entirety will get dismissed in

12    deference to the 2010 information.  And that's the part I

13    didn't think was quite clear.  I have the same initial read the

14    Court just said aloud.

15         THE COURT:  But, then, should this Paragraph 70

16    indicate that this is -- well, it wouldn't be a pending

17    separate charge because this is a case that's included in this

18    revised advisory presentence investigation report.

19         MS. HOFFMAN:  Okay.  So I'm just wrong because it got

20    me confused, I guess.

21         THE COURT:  So should it be struck entirely from

22    the --

23         MS. HOFFMAN:  It is definitely not an independent case

24    from the charges that are pending here.

25         THE COURT:  Mr. Rodriguez, do you agree?

1          MR. RODRIGUEZ:  I agree with counsel.

2          THE COURT:  So you agree that it should be struck from

3    the -- that entire paragraph should be struck from the revised

4    report?

5          MR. RODRIGUEZ:  To be honest with you, your Honor, it

6    would make it cleaner that way.

7          THE COURT:  Because I've never seen a report that

8    included the charges for which the Defendant is being sentenced

9    as a pending charge.

10         I think there may have been some confusion because it

11   started out as one numbered case, became another numbered case

12   in DC and then was Rule 20'd here.

13         MS. HOFFMAN:  That fact of the -- when you move it

14   from number to number -- I might suggest we add as a footnote

15   somewhere earlier just so that when we look at this again in

16   three years because it'll never go away.

17         THE COURT:  So the 05-CR-235:  How did it have two

18   numbers in DC?

19         MS. HOFFMAN:  Because they filed an information in

20   2010, 18 months after he got here -- almost 20 months after he

21   got here, and actually pled him to an information, not the

22   charging document they brought him into the country on.

23         THE COURT:  They filed it as a separate case?

24         MS. HOFFMAN:  They did.  And he signed a waiver,

25   et cetera.

16

1       So that's why I'm saying we might put it in a

2   paragraph earlier as a footnote or something that says Case 1

3   was replaced -- you know, the '05 case was replaced -- was --

4   you know, and then the 2010 information and the '05 is what

5   will be dismissed at the time of sentencing.

6       THE COURT:  So that case is still -- the '05 case is

7   still open in DC?

8       MS. HOFFMAN:  It is.

9       MR. RODRIGUEZ:  Can we just put something on the

10  record so that --

11      MS. HOFFMAN:  I have said that twice here, but I'll

12  say it again.

13      The '05 case --

14      THE COURT:  But that's not my case.

15      MR. RODRIGUEZ:  No.

16      MS. HOFFMAN:  No.

17      THE COURT:  You have to go to DC to get that

18  dismissed.

19      MS. HOFFMAN:  Correct.  I'm going to make the motion

20  before this Court that such is happening just because you're

21  sentencing on the 2010 case, but the DC prosecutor is going to

22  have to actually see to it that it gets done in front of the

23  judge it's pending in front of.

24      THE COURT:  Okay.  So, then, rather than strike that

25  paragraph, I'm going to order Probation in the "Disposition"

1  column to -- after the line "Pending dismissal...", "This

2  case -- the Defendant was subsequently charged with -- charged

3  in an information in Case No." --

4          MS. HOFFMAN:  10-0-008 -- 10-008.  Sorry.

5          THE COURT:  Is that the entire case in DC?

6          MS. HOFFMAN:  It is the entire case.  They then have

7  in parens "RMC."  That's the entire case over in DC.

8          THE COURT:  10-0-008 --

9          MS. HOFFMAN:  I --

10          THE COURT:  -- dash, RMC?

11          MS. HOFFMAN:  It's 10-008 --

12          THE COURT:  10-008-RMC?

13          MS. HOFFMAN:  Yes.

14          THE COURT:  Okay.

15          MS. HOFFMAN:  Thank you, your Honor.

16          THE COURT:  And then it will continue that that

17  case -- or this case was then transferred under Rule 20 to the

18  Southern District of Florida and is now Case No. 11-20244.

19  Correct?

20          MS. HOFFMAN:  Perfect, your Honor.  Thank you.

21          THE COURT:  Do you agree, Mr. Rodriguez?

22          MR. RODRIGUEZ:  Yes.

23          THE COURT:  Got that, Probation?

24          THE PROBATION OFFICER:  Yes, ma'am.

25          THE COURT:  So I will order, then, that the revised

1   advisory presentence investigation report be modified in

2   Paragraph 70.  And I will adopt the factual findings and

3   guideline applications as contained in the revised advisory

4   presentence investigation report as modified.

5        What is the Government's position as far as sentence

6   is concerned?

7        MS. HOFFMAN:  Your Honor, what the United States

8   Government does as part of its agreements with Colombia in the

9   process of extradition is reach an agreement that it will not

10  seek a sentence of life against a Colombian National extradited

11  to the United States.

12       Notwithstanding that agreement, the parties then

13  negotiated a plea agreement that envisioned a sentence of up to

14  35 years at that time, without a discussion or an alteration of

15  that 35-year term for actuarial charts, numbers or

16  determinations.

17       I think that the 35-year sentence in this case, in

18  light of all of the circumstances that are incurred in this

19  case, is appropriate.

20       Mr. Naranjo is one of the original and largest

21  traffickers in Colombia during his time period.  He was the

22  head of one of the largest AUC branches ever existent in

23  Colombia.  The scale of drug-trafficking and activity makes

24  this 35-year sentence appropriate for two cases.

25       THE COURT:  Anything further from you, Mr. Rodriguez?

1      MR. RODRIGUEZ:  Judge, other than present counsel and

2  I, neither one of us participated in these plea negotiations.

3      I just want to make sure that whatever sentence the

4  Court gives, which I'm sure will be fair and just, it is

5  pursuant to the understanding and the agreements of the

6  countries.

7      When counsel was discussing the law and peace and what

8  everything -- all those matters that were going on -- this is a

9  very -- one of the reasons for sealing not only is my client's

10  extensive cooperation, but the high visible profile and the

11  political aspects of this case.

12      And with that, I truly believe that a sentence of up

13  to 35 years, but that which would be commensurate with his life

14  expectancy as is documented by the US Government, would

15  maintain the integrity of the agreements between the countries

16  and we can move forward after that.

17      THE COURT:  And what is the difference between the two

18  cases, between the '11 case and the '07 case?  The '07 case is

19  the transportation.  Correct?

20      MS. HOFFMAN:  Yes, your Honor.

21      THE COURT:  Transportation of the cocaine between

22  October, 2004, and June, 2007?

23      MS. HOFFMAN:  Yes, your Honor.

24      THE COURT:  And the 11-20244 case --

25      MS. HOFFMAN:  It involved activities that started

1    before that, back into 1997, that is not covered within the

2    period of time.

3            And because of the original charging -- the original

4    charging document had underlined very differing statutes, but

5    the final charges ended up coming to similar statutes, your

6    Honor.

7            THE COURT:  So it was different relevant conduct?

8            MR. RODRIGUEZ:  Yes.

9            MS. HOFFMAN:  It was.

10           The original --

11           THE COURT:  A different drug-trafficking organization?

12           MS. HOFFMAN:  Not different organizations, your Honor,

13   but differing prongs of the same organization's activities.

14           For example, the DC case involved the terrorism AUC

15   component of the case charging the aspects of financing of an

16   organization like the AUC through the drug-trafficking

17   activities.

18           THE COURT:  That was the payment to the various

19   paramilitary organizations --

20           MS. HOFFMAN:  Correct.

21           MR. RODRIGUEZ:  Correct.

22           THE COURT:  -- to enable the transportation leg to be

23   able to operate?

24           MS. HOFFMAN:  Correct.

25           THE COURT:  And the '07 case is the transportation

1    leg, separate and apart from that?

2         MR. RODRIGUEZ:  A portion of it.

3         MS. HOFFMAN:  A portion of it, your Honor.

4         The '07 case was -- factually, had it gone to trial,

5    it would have -- assuming both cases had had to go to trial,

6    the '07 case had very discrete planes and boat issues of

7    particularized loads that were ascertainable to have occurred

8    after Mr. -- the Defendant entered into the justice-and-peace

9    process negotiations.

10         So it was possible, had we had to proceed to trial,

11    even though there is the obvious and apparent overlap of dates,

12    to have carved out one case from the other, had we had to try

13    it.

14         THE COURT:  So that was after he was in the program

15    primarily?

16         MS. HOFFMAN:  Yes, ma'am.

17         THE COURT:  And the DC case was prior to the program?

18         MS. HOFFMAN:  And subsequent as well because of the

19    terrorism activities, particularly, which continued on because

20    he -- not -- you know, at the heyday of his organization, there

21    was more than 15,000 members of his -- I can't think of the

22    right word, but I'm going to say branch of the AUC -- while he

23    was in command of that organization and he definitely told his

24    personnel to stand down, to turn over arms, et cetera.  That

25    didn't happen necessarily in the breadth that he had hoped,

1    anticipated or attempted to accomplish.

2         For the record, your Honor, the justice-and-peace

3    process proceedings, the matters continuing in Colombia, are

4    ongoing.  He has not -- the extradition of this Defendant to

5    the United States did not wipe out, eviscerate or relieve this

6    Defendant of the obligations that are -- or agreements he

7    entered into with the Colombian Government either.

8         So one of the components, for example, is a

9    substantial element of the financial penalties for this

10   activity were imposed in Colombia.  And I am unaware of assets

11   that are within the United States in the sole custody and

12   control of this Defendant.

13        So, for example, that's why there's not a massive fine

14   element that might have occurred in a case of this nature in

15   the United States.  The Colombian Government ascertained a

16   figure it believed was the breadth of his assets, went down a

17   couple of million dollars and then expected him to turn over

18   every other component of that.

19        So those are the kinds of adjustments that are being

20   made between Government and countries.

21        MR. RODRIGUEZ:  Your Honor, briefly, may I just

22   address the Court?

23        THE COURT:  Yes.

24        MR. RODRIGUEZ:  Judge, this is very complicated.  I'm

25   sure the Court -- and I've been before this Court on

1    complicated issues.

2         But because of the tremendous interaction and the

3    political ramifications of this case, Mr. Naranjo was

4    initially -- and we can put it right on the record -- financed

5    by our own Government to create a paramilitary force to fight

6    what is now known as the FARC.  He was -- that was the genesis

7    of a private army.

8         From there, they controlled the paste fields, your

9    Honor, and from there they dealt in that product and, as is

10   well documented, sold that product and then it was later

11   distributed.

12        In approximately 2003, he was approached by the

13   then-government in Colombia to broker a deal of bringing in all

14   of the heads of these organizations.  If I could use an example

15   that we're more familiar with, all the capos of Colombia.

16        And he delivered eight of the ten.  One is now dead

17   and one is a fugitive.  And as a result of this, this

18   law-and-peace accord was created.

19        One of the things that he had to do is turn in his

20   men, his military components and everything else and agree to a

21   repatriation of approximately $54 million.

22        THE COURT:  But then he still continued to be involved

23   with cocaine.

24        MR. RODRIGUEZ:  Well, because that's their currency,

25   your Honor.  I'm not making an excuse for it.  That's the

currency.  Because he had to continue to support 7,000 men and their families, which had existed for a long time.  There's no excuse for that.

The point that I'm addressing, your Honor, is that he entered into an agreement with the Colombian government.  That initial agreement did not anticipate his extradition to the United States because that indictment didn't come until after he entered into his agreement, the point being is that he is obligated to the Colombian government to continue that restitution.

If he doesn't, he has agreed to a 60-year sentence.  That's why all these ramifications of not to life and not to this and not to the other thing.

And I just want to address with the Court, I hope and sincerely believe that we will be back here before this Court later -- much later for a significant Rule 35.

But I need to try to maintain the integrity of the agreement between the countries as to a term of imprisonment less than life so that all of these other pieces can fall into place in the future.

THE COURT:  If you would, stand with your client.

The Eleventh Circuit Court of Appeals has set forth a procedure for a sentencing court to follow when there is a request for a variance from the advisory guidelines in the case of the *United States versus Pugh*, 515 F.3d 1179, a 2008

1    decision.

2        And the *Pugh* court found, as does this Court, that

3    pursuant to Supreme Court precedent, including the cases of

4    *Booker*, *Rita* and *Gall*, the federal sentencing guidelines are

5    advisory.  The Court must consult them, but is not bound by

6    them.

7        And the procedure set forth by the *Pugh* court includes

8    the correct calculation of the guidelines and then giving both

9    parties the opportunity to argue for whatever sentence they

10   deem appropriate and then this Court should consider the

11   3553(a) factors to determine whether they support the requested

12   sentence.

13       And here, the advisory guidelines are life.  The

14   Government has requested, pursuant to honoring its agreement

15   with the Colombian Government and not seeking a term of life

16   imprisonment, a sentence of 35 years, and the Defendant

17   requests a sentence of 30 years.

18       So I turn now to the 3553(a) factors.

19       The first factor that the Court shall consider under

20   Title 18, United States Code, Section 3553(a), is the nature

21   and circumstances of the offense and the history and

22   characteristics of the Defendant.

23       The Defendant stands before the Court having pled

24   guilty to two separate cases involving the -- involving very

25   large-scale drug-trafficking of cocaine from Colombia to the

1    United States and the creation of and utilization of

2    paramilitary organizations -- or a paramilitary organization to

3    accomplish the drug trafficking -- to enable the transportation

4    leg and importation of large amounts of cocaine into the United

5    States.

6         He has pled guilty to two counts in the '07 case and

7    two counts in the case that was Rule 20'd from Washington, DC,

8    which is now the 11-20244 information.

9         And in the revised advisory presentence investigation

10   report, the Court notes the following:

11        At Paragraph 37, Carlos Mario Jimenez Naranjo was

12   involved in the conspiracy from at least 1997 until 2007.  He

13   was the supplier of the cocaine to the organization.

14        He recruited his cousin, Jesus Maria Alejandro Sanchez

15   Jimenez, to assist in organizing the sale and transportation of

16   the cocaine shipments out of Colombia.

17        As head of the organization, he controlled the assets

18   and received a larger share of the proceeds.  He is responsible

19   for at least 4,935 kilograms of cocaine and $525,000 of

20   laundered funds.

21        At Paragraph 17, the revised advisory presentence

22   investigation report indicates and states:  Carlos Mario

23   Jimenez Naranjo was one of the principal leaders of the

24   Colombian paramilitary and drug-trafficking organization known

25   as the AUC, the Auto Defensas Unidas -- a-u-t-o,

1  d-e-f-e-n-s-a-s, u-n-i-d-a-s -- de Colombia -- d-e,
2  C-o-l-o-m-b-i-a -- AUC, which was funded primarily through
3  narcotics proceeds.

4      The AUC earned money by controlling access to coca
5  cultivation regions by taxing cocaine base and hydrochloride
6  production and by providing security for cocaine laboratories.

7      The AUC provided transportation for cocaine shipments
8  within Colombia to move coca base to clandestine cocaine
9  laboratories and refine cocaine from laboratories to transit
10 points along the coast.

11     The AUC charged transportation groups attacked for
12 access to AUC territory and to provide security for the
13 movement of drugs within Colombia.

14     Specifically, the Norte del Valle cartel -- that's
15 n-o-r-t-e, d-e-l, v-a-l-l-e -- employed the services of the
16 AUC to protect its distribution routes and cocaine labs as well
17 as to provide personal security.

18     Paragraph 18:  From the mid-1990s through 2007,
19 Jimenez Naranjo controlled cocaine production and distribution,
20 maritime seaports and clandestine air strips in vast areas of
21 Colombia through an army of several thousand armed soldiers.

22     Jimenez Naranjo used this paramilitary army to assume
23 and maintain control of areas of Colombia which the
24 organization used to cultivate, process, transport and export
25 cocaine to Central America, Mexico and the United States.

1          So I think those three paragraphs included in the

2    revised advisory presentence investigation report give a fair

3    assessment of the Defendant's role and involvement in this very

4    large-scale drug-trafficking organization, which also included

5    a paramilitary organization that he was also in charge of,

6    which then provided security bases and helped in the

7    transportation of very large amounts of cocaine out of Colombia

8    and into the United States.

9          The Court also has to consider the history and

10   characteristics of the Defendant.

11         Aside from his role in these offenses, he has no prior

12   criminal history.  But it seems that, for approximately ten

13   years, he was an extraordinarily major drug-trafficker in

14   Colombia, head of a very large-scale drug-trafficking

15   organization and paramilitary units.

16         I believe his counsel indicated -- and I think it

17   also is indicated in the report -- an army of approximately

18   10,000 paramilitary units who assisted in the production and

19   transportation, exportation from Colombia and importation into

20   the United States of large amounts of cocaine.

21         The Court then has to consider the need for the

22   sentence imposed to reflect the seriousness of the offense, to

23   promote respect for the law and to provide just punishment for

24   the offense, to afford adequate deterrence to criminal conduct

25   not only of this Defendant, but to others who may be

considering such conduct, the advisory guidelines as well as the need to avoid unwarranted sentencing disparities among Defendants with similar records who have been found guilty of similar conduct, as well as the other factors under 3553(a).

Having considered all of the 3553(a) factors, including the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and provide just punishment and adequate deterrence, I find that a sentence of 396 months, or 33 years, is the appropriate sentence to run concurrently on both these cases.

It is reasonable and just. It takes into account the role of this Defendant, the nature and circumstances of the offense and the need for the sentence to reflect the seriousness of the offense and to promote respect for the law and provide just punishment.

It also takes into account and, I find, respects the agreement between the United States and the Government of Colombia. That agreement actually is between the Executive Branch of the Government and the Government of Colombia that they would not seek a term of life imprisonment.

And I find that this sentence of 396 months honors that agreement and respects that agreement as the advisory guidelines are a term of life, which under our federal system is indeed life imprisonment.

1             But here, with a sentence of 396 months, the Defendant

2    will be eligible for gain time and it is not a term of life.

3    It is a finite amount of months.

4             The Court has considered the statements of the

5    parties, the revised advisory presentence investigation report

6    as modified at this hearing, which contains the advisory

7    guidelines and the statutory factors set forth in Title 18,

8    United States Code, Section 3553(a)(1) through (7).

9             Are you CJA-appointed, Mr. Rodriguez?

10            MR. RODRIGUEZ:  No, your Honor.

11            THE COURT:  Based upon the revised advisory

12   presentence investigation report, it is the finding of the

13   Court that the Defendant is not able to pay a fine; and,

14   therefore, no fine shall be imposed.

15            Pursuant to the Sentencing Reform Act of 1984, it is

16   the judgment of the Court that the Defendant, Carlos Mario

17   Jimenez Naranjo, is hereby committed to the custody of the

18   United States Bureau of Prisons to be imprisoned for a term of

19   396 months as to Counts 1 and 18 in Case No. 07-20794 and

20   Counts 1 and 2 of Case No. 11-20244, all such terms to run

21   concurrently.

22            Upon release from imprisonment, the Defendant shall be

23   placed on supervised release for a term of ten years as to

24   Docket No. 07-20794 and Docket No. 11-20244, all such terms to

25   run concurrently.

1            Within 48 hours of release from the custody of the

2    United States Bureau of Prisons, the Defendant shall report in

3    person to the probation office in the district to which he is

4    released.

5            While on supervised release, the Defendant shall not

6    commit any federal, state or local crimes; he shall be

7    prohibited from possessing a firearm or other dangerous device;

8    and he shall not possess a controlled substance.

9            He shall cooperate in the collection of DNA and shall

10   comply with the standard conditions of supervised release that

11   have been adopted by this Court and with the following special

12   conditions:

13           At the completion of the Defendant's term of

14   imprisonment, the Defendant shall be surrendered to the Bureau

15   of Immigration and Customs Enforcement for removal proceedings

16   consistent with the Immigration and Nationality Act.

17           If the Defendant is removed or if he voluntarily

18   leaves the United States, he shall not reenter the United

19   States without the prior express written permission of the

20   Secretary for Homeland Security.

21           The term of the supervised release period shall be

22   nonreporting while the Defendant resides outside the United

23   States.

24           If the Defendant should receive the prior express

25   written permission of the Secretary for Homeland Security and

1    reenter the United States within the term of the supervised

2    release period, he is to report to the nearest United States

3    Probation Office in the district to which he reenters within

4    48 hours of his arrival.

5           It is further ordered that the Defendant shall pay to

6    the United States a special assessment of $100 as to each count

7    of conviction, for a total of $400, which shall be due

8    immediately.

9           Does the Government have a motion to make regarding

10   any remaining counts?

11          MS. HOFFMAN:  As to the counts that are remaining in

12   the '07 case, which originated here in the Southern District of

13   Florida, we would move to dismiss the remaining charges at this

14   time.

15          While I know the Court can't actually grant the next

16   thing, for the record purposes of the transcript, the

17   Government will be seeking the dismissal of the '05 case, which

18   continues to be pending, in Washington, DC.

19          THE COURT:  So in the 11-20244 case, there were only

20   the two counts of the information?

21          MS. HOFFMAN:  Correct, your Honor.

22          THE COURT:  All right.  As to the 07-20794 case, I

23   will grant the Government's motion to dismiss the remaining

24   counts.

25          Mr. Jimenez, it is my duty to inform you, sir, that

1   you have 14 days with which to appeal the judgment and sentence

2   of this Court.  Should you desire to appeal and be without

3   funds with which to prosecute an appeal, an attorney will be

4   appointed to represent you in connection with that appeal.

5           Should you fail to appeal within that 14-day period,

6   it will constitute a waiver of your right to appeal.

7           It is also my duty to elicit from counsel from both

8   sides fully articulated objections to the Court's finding of

9   facts and conclusions of law as announced at this sentencing

10  hearing and to further elicit any objections which either side

11  may have to the manner in which sentence was imposed in this

12  case.

13          Are there any objections from the Government?

14          MS. HOFFMAN:  No, your Honor.

15          THE COURT:  From the Defendant?

16          MR. RODRIGUEZ:  Nothing that hasn't previously been

17  recited on the record, your Honor.  But I do have several

18  recommendations, if the Court would entertain them at the end.

19          THE COURT:  Okay.  And I will -- well, go ahead,

20  Mr. Rodriguez.  Strike that.

21          MR. RODRIGUEZ:  Your Honor, there were two things.

22          One, that Mr. Jimenez Naranjo receive credit for his

23  period of incarceration from August 16, 2006, pursuant to

24  18, USC, 3585(b).

25          THE COURT:  So you want me to recommend that to the

1   Bureau of Prisons?

2          MR. RODRIGUEZ:  It's my understanding that it has to

3   be part of your judgment, your Honor.  I recently had this

4   matter addressed.  If it's not in the judgment, they won't give

5   him that credit.

6          MS. HOFFMAN:  I don't have any personal experience

7   with this issue, your Honor, except to be able to tell you that

8   the last five or six sentencings that I've done that are

9   Colombian-based have -- defense counsel has made the same

10  representations about problems they're having in the FDCs.

11         THE COURT:  So you want me to reduce his sentence?

12         MR. RODRIGUEZ:  No.

13         MS. HOFFMAN:  No.

14         THE COURT:  You just want me to include in the

15  judgment and commitment order that his sentence be reduced --

16  that he receive credit for time served in Colombia pursuant to

17  Title 18, United States Code, Section 3585(b), since

18  August 16th, 2006, to May 6th, 2008?

19         MR. RODRIGUEZ:  You don't even have to put in the

20  latter part.  Just say from August 16th, 2006.

21         THE COURT:  Okay.

22         MR. RODRIGUEZ:  Thank you.

23         THE COURT:  I'll grant that request.

24         MR. RODRIGUEZ:  Thank you.

25         The other one being, if possible, a recommendation

1    that he eventually be incarcerated in the state of Florida.

2           THE COURT:  It's my understanding they're now asking

3    for reasons.

4           So what is the reason.

5           MR. RODRIGUEZ:  Reasons?

6           One, continued cooperation with the Government.

7           THE COURT:  That's what I'm told by defense counsel.

8           I'm sorry?

9           MR. RODRIGUEZ:  One, continued cooperation with the

10   Government.

11          Two, closest to his country and access to Colombian

12   counsel here that he needs to continue to address because of

13   his law-and-peace accord.

14          THE COURT:  I'll recommend that he be placed in an

15   institution in Florida or as close to Florida as possible,

16   based upon the proximity to the country of Colombia.

17          MR. RODRIGUEZ:  That's fine, your Honor.

18          THE COURT:  This judgment and commitment order is

19   going on the public record?

20          MR. RODRIGUEZ:  Well, that's my third item.

21          Your Honor, we're requesting that the matters continue

22   to be sealed because of his ongoing cooperation.

23          On a weekly basis, I receive inquiries from Colombia.

24   And I can't speak for the Government, but there's ongoing

25   information that is being exchanged, people that are being

```
 1    sought, people that are being surrendered to the country, which
 2    would dramatically be affected if the public was aware that the
 3    emperor is dead.
 4         The perception may be there, but we've tried to guard
 5    that so that he can continue to cooperate and assist the
 6    Government.
 7         So I'm asking that the matter continue to be sealed.
 8    And we will address it with the Court on a periodic basis, but
 9    I cannot say that it will be happening.  But I anticipate that
10    we'll be before the Court on a Rule 35 in the future.
11         THE COURT:  What's the Government's position?  Let me
12    ask what the status is now.
13         The entire case is sealed, both cases?
14         MS. HOFFMAN:  Yes, your Honor.
15         THE COURTROOM DEPUTY:  No.
16         THE COURT:  No, it's not.  It comes up with his name.
17    Right?
18         THE COURTROOM DEPUTY:  Yes.  Only the Rule 20 is
19    sealed.  The other is not.
20         MS. HOFFMAN:  Your case as well has been sealed up
21    until now.  I've never been able to pull anything off of PACER
22    for your case, your Honor, nor do I get --
23         MR. RODRIGUEZ:  The case in its entirety, because
24    there are other Co-Defendants, is not sealed.
25         THE COURT:  Okay.
```

MR. RODRIGUEZ:  All documents relating to Mr. Jimenez

Naranjo --

THE COURT:  You're correct.

MR. RODRIGUEZ:  -- are sealed.

All we're asking is anything dealing with Jimenez

Naranjo continue to be sealed, not seal the case.

THE COURT:  And what's the Government's position?

MS. HOFFMAN:  The Government's position is that at

this time I do need to continue this.  I'm not sure

Mr. Rodriguez and I will continue to be on the same page on the

length of that sealing.  But as of today, I do think it still

needs to remain sealed.

THE COURT:  And that's based upon continued

cooperation?

MS. HOFFMAN:  Yes.

THE COURT:  Give me a time frame.

MS. HOFFMAN:  Your Honor, could we set this for at

least three months, but potentially six months for review for

the sealing?

I think anything short of three months will be a

time-spinner for the Court.  I don't think we'll resolve issues

within three months.  But within six months, there may be an

opportunity for a substantial decision one way or the other.

MR. RODRIGUEZ:  Your Honor, I would agree.  I'd just

ask the Court either to set it for status or we will jointly

report to the Court or jointly file a motion for the unsealing.

THE COURT:  Well, in looking at the docket regarding the Defendant, there are multiple entries regarding the Defendant already on the public record, including execution of the arrest warrant.

MR. RODRIGUEZ:  Your Honor, the significance of it is the final sentencing determination, which all of us have been trying to preserve, just in trying to maintain that.

The perception may be that he has cooperated.  The perception may be that he's resolved.  But there's nothing in writing.  As long as that perception exists --

THE COURT:  Well, but the plea agreement was sealed.

MR. RODRIGUEZ:  The hearing --

THE COURT:  And the sentencing memorandums and the hearings have been sealed.

But why would the judgment have to -- I mean, it shows that he was arrested.  It shows that he was indicted.  It shows that he is present in the system here.

I'm just not sure I understand why the judgment would have to be --

MR. RODRIGUEZ:  I'm not saying the judgment.  I want the other documents also to maintain the sealing, your Honor.

THE COURT:  I don't have any problem maintaining what's been sealed already.

MR. RODRIGUEZ:  Right.  The judgment --

1          THE COURT:  The question is the judgment and

2   commitment order.

3          MR. RODRIGUEZ:  Let me cut right to the chase, your

4   Honor.

5          The perception may be that the emperor is dead; and

6   the emperor can accomplish a lot.  Once bin Laden is gone,

7   other things happen.  Once they know this, this is going to be

8   reported.

9          Once that perception is reality, that he has been

10  sentenced to a term of 30 years or whatever, I believe that any

11  significant cooperation or things that we're trying to do with

12  the Government will run stale.  We've already had that.

13         We're trying to preserve that just so that it doesn't

14  happen.  That's all I'm trying to tell the Court.  And I could

15  be more specific if the Court wants.

16         THE COURT:  Does the Government agree with that?  I

17  mean, there's an arrest warrant executed.  There's scheduling

18  orders.  There's -- I mean, he's here in the system.  There's

19  an order to continue trial, arraignment, the second superseding

20  indictment.

21         MR. RODRIGUEZ:  Judge --

22         THE COURT:  It's when we get to the plea and the

23  sentencing is when the sealed documents start coming up.

24         MR. RODRIGUEZ:  From the inception -- and counsel and

25  I weren't present -- everything I've read and everybody I've

```
 1    talked to, the whole purpose was to preserve and being able to
 2    obtain more intelligence and prosecutable cases against other
 3    individuals.  That started in Washington, DC.
 4         The perception was that we needed to maintain this
 5    sealed.  Everything in DC from the very beginning is sealed.
 6    When it was brought here -- and we agreed to have it all
 7    brought before the Court so that we could consolidate these
 8    matters -- at that time when he was brought before this Court,
 9    then that's when the Court allowed us to seal the motions to
10    put it off, my memorandum, the plea agreements.  And now we get
11    to the judgment.
12         We're going to work vigorously, but there's ongoing
13    things almost on a weekly basis that are going on.  And I just
14    know from having been in this and know what has happened to
15    other individuals that we've been dealing with that, when that
16    perception is pierced and they realize that he has been
17    condenado, when he has been sentenced in the United States -- I
18    think it would lose its effect.
19         THE COURT:  What's the Government's position?
20         MS. HOFFMAN:  This is the first Defendant that I've
21    done this with, and this sealing process and procedure came to
22    me with the case being returned to me.
23         At the risk of telling the Court just a tiny bit more
24    than the Court wants to know, it is my intention and why I said
25    three months is to pull this Defendant out on a set schedule
```

1   every week for the next few months because I have -- as the

2   Court saw, you have one Defendant before you.

3        There are multiple Defendants before Judge Altonaga

4   that are, in truth, here in the United States because, however

5   it was accomplished, Mr. Jimenez Naranjo spoke directly with

6   people and said, "Turn yourself in" and they did.

7        There are, that I can think of, five persons right now

8   in the process for which I intend to put Mr. Jimenez Naranjo

9   directly in communication with them to see if I can accomplish

10  the same purpose.

11       Do I think that he'll lose all authority or sway that

12  he has if it becomes known?  I'm not so sure I'm entirely

13  positive, but I'm not willing to risk it either, given how long

14  this thing has been sealed.

15       My sense of it is that the unsealing and, therefore,

16  the public's right to know will not be unduly harmed by three

17  more months of sealing it.

18       On a continued and indefinitely, you know, *ad*

19  *infinitum* sealing, probably that would be contrary to the

20  public interest in knowing the resolution of cases.

21       THE COURT:  I will grant the sealing of the judgment

22  and commitment order for three months, and we'll set a status

23  before the three-month time is up and you can tell me what the

24  status is at that time and show cause why the judgment and

25  commitment order should not be unsealed at that time.

1           MS. HOFFMAN: Thank you, your Honor.

2           THE COURT: So I need a three-month date, please --

3   prior to three months, please, Patricia.

4           THE COURTROOM DEPUTY: August 22nd at 2:15.

5           MR. RODRIGUEZ: Oh. Anything for the 23rd, your

6   Honor?

7           THE COURT: Okay.

8           MR. RODRIGUEZ: I'll be driving back from taking

9   someone to college that weekend.

10          THE COURT: Okay.

11          MS. HOFFMAN: Me, too.

12          THE COURT: Okay.

13          MR. RODRIGUEZ: That's the week -- school starts that

14  day.

15          THE COURT: That's fine.

16          MR. RODRIGUEZ: Anytime -- the 23rd or after.

17          THE COURT: When is the 90 days up, Patricia? What's

18  today? Today is the 9th. Actually, the 90 days is the 9th of

19  August.

20          This is what I'm going to do: I'm going to have it

21  sealed until -- rather than do it for 90 days, I'm going to

22  have it sealed until August 31st, and we'll set it on the 29th.

23          MR. RODRIGUEZ: Fine.

24          THE COURT: Okay?

25          MS. HOFFMAN: Thank you, your Honor.

1            Your Honor, may we make one other exception from the

2    sealing in a very limited capacity?

3            I believe this -- you're going to get instantaneously

4    a motion for the copy of the transcript of this hearing.  Can

5    we handle now that it would be appropriate for the Government

6    or defense counsel to request a copy of the transcript of this

7    hearing to be released to ourselves and the Court's chamber

8    alone?

9            THE COURT:  Any objection?

10           MR. RODRIGUEZ:  I asked for it.

11           THE COURT:  Yes.  You may have a -- I will release the

12   transcript to counsel.

13           MR. RODRIGUEZ:  Thank you, your Honor.

14           And thank you.

15           THE COURT:  So I need a status date and time for the

16   29th.

17           THE COURTROOM DEPUTY:  At 2:30, Judge.

18           THE COURT:  2:30, August 29th.

19           MS. HOFFMAN:  Thank you, your Honor.

20           MR. RODRIGUEZ:  Thank you, your Honor.

21           THE COURT:  The judgment and commitment order is

22   sealed until August 31st.

23           Anything further?

24           MS. HOFFMAN:  No, your Honor.

25           MR. RODRIGUEZ:  No, your Honor.

1          THE COURT:  Thank you.  We're in recess in this

2    matter.  The courtroom is unsealed.

3              (Proceedings concluded.)

4

5                    C E R T I F I C A T E

6

7          I hereby certify that the foregoing is an accurate

8    transcription of the proceedings in the above-entitled matter.

9

10

11    _____          /s/Lisa Edwards_____
      DATE                   LISA EDWARDS, CRR, RMR
12                           Official United States Court Reporter
                             400 North Miami Avenue, Twelfth Floor
13                           Miami, Florida 33128
                             (305) 523-5499
14

15

16

17

18

19

20

21

22

23

24

25